UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALTARUM INSTITUTE**,<br><br>    Plaintiff,<br>    Counterclaim Defendant,<br><br>            v.<br><br>**ELIZABETH MALONEY**,<br><br>    Defendant,<br>    Counterclaim Plaintiff. | Case No. 22-cv-2574 (CRC) |

## MEMORANDUM OPINION AND ORDER

Plaintiff/Counterclaim Defendant Altarum Institute, a Michigan-based non-profit, sued Defendant/Counterclaim Plaintiff Elizabeth Maloney for breach of contract. Until her resignation in January 2022, Maloney served as president of an Altarum subsidiary in Maryland, Palladian Partners, Inc., which provides communications services to clients in the healthcare industry. Altarum's complaint alleges that when Maloney left Palladian, she reneged on her obligation to return an accelerated bonus payment of $206,885.30 which she had received two months earlier. Maloney filed an answer to the complaint along with numerous counterclaims.

The Court bifurcated discovery and directed the parties to address Altarum's breach-of-contract claim before turning to Maloney's counterclaims. After completing this first phase of discovery, both sides have moved for summary judgment on Altarum's contract claim. Their disputes center on whether the pay-schedule provisions in Altarum's bonus contracts are enforceable and whether Maloney breached those provisions by failing to repay her accelerated bonus. Finding that the provisions are enforceable and Maloney breached them, the Court will grant Altarum's motion for summary judgment and deny Maloney's.

I.  **Background**

Altarum is a healthcare nonprofit with headquarters in Ann Arbor, Michigan. Pl.'s Mot. Summ. J. [ECF No. 47], Ex. A ¶ 5. Maloney served as the president of Altarum's subsidiary Palladian from February 1, 2011 until January 31, 2022. Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ("Def.'s Resp.") [ECF No. 49–1] ¶¶ 3–6. She worked out of Palladian's offices in Silver Spring, Maryland until the beginning of the COVID-19 pandemic, at which point she primarily worked from her home in Washington, D.C. Id. ¶¶ 6–10.

A.  Executive Management Incentive and Retention Plan

Prior to the events at issue, Altarum established an Executive Management Incentive and Retention Plan (the "Executive Plan") to "provide[] annual and long-term performance-based incentives to Executive Managers," including Palladian executives. Def.'s Resp. ¶¶ 11–14; Def.'s Mot. Summ. J., Ex. 3 ("Executive Plan") § 1. The Executive Plan's stated purpose was "to attract and retain key talent, motivate the organization's leaders, and enhance Altarum's ability to accomplish its mission – by providing meaningful rewards for the achievement of significant results aligning with the primary corporate goals." Executive Plan § 1.

Under the terms of the plan, executives were awarded an incentive bonus each year based on a range of performance measures. Id. §§ 5, 7. But payment of that bonus was deferred. Altarum disbursed the award over a three-year period following "the Plan Year" (*i.e.*, the year for which the executive received the award) with "50% being paid the first following year and 25% on April 1st of each of the two subsequent years." Id. § 4. The Executive Plan also divided the first-year disbursement (the 50% sum) into two payments. That disbursement was initially calculated "based on pre-audit financial results of the Plan Year," and 80% (or 40% of the total award) was paid around "April 1st of the calendar year following the Plan Year." Id. § 7. Any

remaining balance of the 50% (roughly 10% of the total award) was paid after Altarum's external accounting firm audited its financial statements, generally "on or about May 15th of the calendar year following the Plan Year." Id.[1] The following table summarizes the payment schedule.

| Percentage Paid | Date |
| --- | --- |
| 40% | Around April 1 of Plan Year + 1 |
| 10% | Around May 15 of Plan Year + 1 |
| 25% | April 1 of Plan Year + 2 |
| 25% | April 1 of Plan Year + 3 |

For executives who earned bonuses each year, their deferred payments stacked, such that in any given year, they would recoup bonus amounts from each of the previous three years. So, for example, under the framework of the plan, an executive who earned bonuses in 2019, 2020, and 2021 would receive the following on April 1, 2022: 25% of the 2019 bonus, 25% of the 2020 bonus, and 40% of the 2021 bonus. Then, following Altarum's external audit, the executive would receive an additional 10% of the 2021 bonus on May 15, 2022.

These deferred payments constituted the "Participant's Account Balance," and the Executive Plan provided that "[e]xcept for instances involving a Participant's Retirement, Death, Disability, or authorized leave of absence, a scheduled payment is payable only if the Participant continues to be an active Altarum employee on April 1st of such payment year." Id. § 4. The plan further provided that "[t]he severing of employment with Altarum, voluntary or involuntary,

---

[1] The May disbursement was the "remaining balance" of the first-year payment such that, if Altarum had to adjust the total award following the audit, that remainder would not necessarily constitute 10% of the total award. See Executive Plan § 7. ("Any remaining balance of such first following year 50% scheduled payment, determined after the final calculation of the total award, will be paid as soon as practical after the consolidated audited financial statements of the Plan Year (audited by Altarum's external accounting firm) are approved and the actual financial criteria used in determining the incentive award is verified."). To simplify matters, the Court will refer to the May payment as 10% of the total award.

for any reason other than Retirement, Death, Disability, or an authorized leave of absence shall cause the Participant to forfeit his or her Account Balance." Id.; see also id. § 10 ("Generally a Participant forfeits any current Plan Year incentive award and the Participant's Account Balance if employment is terminated for any reason other than Retirement, Death, or Disability.").

### B. Accelerated Payment Election Policy and Election Form

The pay schedule in the Executive Plan was not the end of the story. Altarum permitted executives to "accelerate" bonus payments by opting into an "Accelerated Payment Election Policy." See Pl.'s Mot. Summ. J., Ex. B(5)(F) ("Accelerated Payment Policy"). Under the policy, executives could "elect accelerated payment of a whole percentage of each regularly scheduled payment of the applicable incentive award." Id. §§ 1–2. The terms and conditions of the Accelerated Payment Policy were further governed by an Accelerated Payment Election Form that executives completed in advance of each fiscal year. See Def.'s Resp. ¶ 22. Per the terms of the form, instead of receiving payments on April 1 or May 15 of the following year, executives could elect to receive payments in the "first payroll" of either December of that year or January of the next year. Pl.'s Mot. Summ. J., Ex. B(5)(E); Def.'s Mot. Summ. J., Ex. 6 ("Accelerated Payment Form") at 1. So, for example, instead of receiving the deferred portions of their 2019, 2020, and 2021 awards in April and May 2022, executives could receive those portions in December 2021 or January 2022. The early payment date was defined as the "Accelerated Payment Date." Id.

The form included a caveat, however. As part of a section titled "Participant's Acknowledgement and Signature," executives agreed to the following: "if I receive the Accelerated Payment and I am not employed at Altarum on the regularly scheduled payment date

next following the Accelerated Payment Date, [] I must immediately repay to Al[t]arum the full principal amount of the Accelerated Payment." Id. at 2.

In December 2020, Maloney executed an Accelerated Payment Form, whereby she elected to receive in early December 2021 100% of each payment she otherwise would have been owed on April 1 or May 15, 2022. Id. at 1. These payments represented 50% of her 2021 award, 25% of her 2020 award, and 25% of her 2019 award.[2]

### C. Maloney's Accelerated Payment, Resignation, and Failure to Repay the Accelerated Payment

On December 1, 2021, Maloney received the accelerated payment for 2022, which totaled $206,885.30. Def.'s Resp. ¶¶ 49–50; Pl.'s Mot. Summ. J., Ex. B(2). Because of federal and state income taxes and related withholdings, Maloney's netted only $138,240.86. Pl.'s Mot. Summ. J., Ex. B(2) at 1–2.

On January 5, 2022, she announced her intention to resign from Palladian and later decided that January 31 would be her last day. Def.'s Resp. ¶¶ 51, 59. On January 14, Maloney emailed Altarum's general counsel and acknowledged that the company's chief human rights officer had reminded her "that [her] departure before the spring milestones for bonuses would require the repayment of the December accelerated bonus payment." Pl.'s Mot. Summ. J., Ex. B(11) at 1; see also Def.'s Resp. ¶ 52. Maloney wrote, "I will fully comply with the established executive bonus policy," and later in the email added "I'll cooperate with HR on the return of the December bonus payment." Pl.'s Mot. Summ. J., Ex. B(11) at 1. Maloney now claims that, at that time, she "was not sure she owed the Accelerated Payment" but "cooperated with Altarum to ensure that [it] maintained her health insurance and actively helped remediate an issue getting a

---

[2] Under the terms of the form, Maloney actually could only elect—and did elect—to receive 60% of the initial 50% of her 2021 award that she would have received in April and May 2022 otherwise. Accelerated Payment Form at 1.

5

specialty pharmaceutical processed" for a family member.  Def.'s Statement of Undisputed Material Facts [ECF No. 49–1] ¶ 9.

Later that month, Maloney emailed the director of human resources and noted that she had received a letter from Altarum stating it "expect[ed] $203,885.46 by February 15th."  Pl.'s Mot. Summ. J., Ex B(3) at 1; see also Def.'s Resp. ¶ 71.  Maloney, however, asked for "clarif[ication]" on two points.  She wrote, "I need my W-2 modified to reflect the lower total compensation in 2021" and asked for "advi[c]e on how [to] recoup the withholdings."  Pl.'s Mot. Summ. J., Ex B(3) at 1.  She then added, "I would feel better writing a check for $138,240.86 until the other items are clear to me; that I get a refund on the withholdings and a modified W-2."  Id.

On February 28, however, Maloney informed Altarum that she would not return the accelerated payment.  Def.'s Resp. ¶ 76.  And she has been true to her word:  To date, Maloney has not repaid any of her bonus.  Id. ¶¶ 77–78.  She admits, however, that she is not retired, has not become disabled since January 31, 2022, is not dead, and did not take an authorized leave of absence.  Id. ¶ 65.

D.  Procedural Background

In August 2022, Altarum filed a two-count complaint against Maloney, claiming breach of contract and unjust enrichment.  Compl. [ECF No. 1].  Maloney answered, raising affirmative defenses and also counterclaiming against Altarum on a number of grounds.  Answer & First Counterclaim [ECF No. 11].  After denying Altarum's motion for judgment on the pleadings and allowing Maloney to partially amend her answer, the Court bifurcated discovery.  Op. & Order [ECF No. 29].  It directed the parties to "resolve any remaining factual disputes on Altarum's breach of contract claim" and brief that issue on summary judgment before taking discovery on

Maloney's counterclaims.  Id. at 5–6.[3]  Having completed this first phase of discovery, both sides have moved for summary judgment on Altarum's contract claim.  Their motions are fully briefed and ripe for resolution.

## II. Legal Standards

Courts must grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The burden of demonstrating "absence of a genuine issue of material fact" lies with the movant.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1).

When deciding a motion for summary judgment, courts must "view the facts and draw reasonable inferences 'in the light most favorable to the [non-moving] party . . . .'"  Scott v. Harris, 550 U.S. 372, 378 (2007) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).  The non-movant may not, however, rely on "mere allegations" or conclusory statements to defeat a motion for summary judgment.  Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006) (Rogers, J., concurring).  On cross-motions for summary judgment, each party "must carry its own burden under the applicable legal standard."  Mitchell v. Pompeo, No. 1:15-cv-1849 (KBJ), 2019 WL 1440126, at *4 (D.D.C. Mar. 31, 2019) (quoting Ehrman v. United States, 429 F. Supp. 2d 61, 67 (D.D.C. 2006)).  A "cross-motion for summary judgment

---

[3] Following the Court's rulings on these issues, Maloney switched counsel.  She was initially represented by a family member who appears to specialize in business law and securities regulation; she has since retained experienced employment-litigation counsel.

7

does not concede the factual assertions of the opposing motion." Id. (quoting CEI Wash. Bureau, Inc. v. DOJ., 469 F.3d 126, 129 (D.C. Cir. 2006)).

### III. Analysis

The parties spar over two primary issues: (i) whether the pay-schedule provisions in the bonus contract are unenforceable under D.C. and Maryland law and (ii) whether Maloney breached those provisions. The Court will address each in turn.

    A. <u>Enforceability of the Executive Plan and Accelerated Payment Form</u>

Maloney claims that the pay-schedule provisions of the Executive Plan and Accelerated Payment Form are unenforceable because they violate D.C.'s Wage Payment and Collection Law ("DCWPCL"), D.C. Code §§ 32–1301 et seq. and Maryland's Wage Payment and Collection Law ("MWPCL"), Md. Code Lab. & Empl. §§ 3–501 et seq. Def.'s Mot. Summ. J. at 6–9. According to Maloney, both statutes require an employer to pay an employee her earned wages (including the accelerated payment here) regardless of whether the employee subsequently quits or is terminated. Id. Altarum responds that neither the DCWPCL or MWPCL applies here because the Executive Plan's choice-of-law provision states that the plan "shall be construed and enforced in accordance with the laws of the State of Michigan." See Pl.'s Reply at 3–4; Executive Plan § 12. The parties do not dispute that Michigan does not have a comparable earned-wages law. Altarum has the better argument.

In diversity jurisdiction cases, "the law of the forum state supplies the applicable choice-of-law standard." Williams v. First Gov't Mortg. & Invs. Corp., 176 F.3d 497, 499 (D.C. Cir. 1999). And under D.C. law, courts enforce express contractual choice-of-law provisions "'as long as there is some reasonable relationship with the state specified.'" Ekstrom v. Value Health, Inc., 68 F.3d 1391, 1394 (D.C. Cir. 1995) (quoting Norris v. Norris, 419 A.2d 982, 984

(D.C. 1980)). Where, as here, the choice-of-law provision designates the state where the company's headquarters are located, the "requisite reasonable connection exists" between the provision and the state, and the "provision[] [is] enforceable." Sickle v. Torres Advanced Enter. Sols., LLC, No. 11-cv-2224 (KBJ), 2020 WL 5530357, at *11 (D.D.C. Sept. 14, 2020) ("[Defendant] is a Virginia limited liability company that maintains its principal place of business in Falls Church, Virginia. . . . Thus, the requisite reasonable connection exists between the parties' contracts and the chosen state [Virginia], such that these parties' contractual choice-of-law provisions are enforceable, if applicable."); Whiting v. AARP, 637 F.3d 355, 361 (D.C. Cir. 2011) ("AARP, the Plan sponsor, is based in the District of Columbia, and therefore effect should be given to the contractual choice of law clause," which designated D.C. law as governing).

Courts may, however, "decline to enforce contractual choice of law provisions that contravene a 'fundamental policy' of a state with 'a materially greater interest than the chosen state.'" Orchin v. Great-W. Life & Annuity Ins. Co., 133 F. Supp. 3d 138, 148 (D.D.C. 2015) (cleaned up) (quoting Restatement (Second) of Conflicts of Law § 187(2)). "Maryland common law—to which D.C. law 'commonly looks for guidance in the absence of its own precedents'—recognizes this exception." Id. (cleaned up) (citing Athridge v. Aetna Cas. & Sur. Co., 351 F.3d 1166, 1171 (D.C. Cir. 2003)). But the exception does not apply "merely because Maryland [or D.C.] law is dissimilar to that of another jurisdiction." Nat'l Glass, Inc. v. J.C. Penney Props., Inc., 650 A.2d 246, 249 (Md. 1994) (cleaned up). "Rather, for another state's law to be unenforceable, there must be a strong public policy against its enforcement." Id. (cleaned up). "Maryland courts thus typically reserve application of the public policy exception to unusual circumstances, such as where a statute expressly states that its violation would be contrary to

9

public policy, or where application of another state's law would violate policy expressed in Maryland's state constitution." Orchin, 133 F. Supp. 3d at 149 (cleaned up).

In Orchin, the court found a contract's choice-of-law provision did not fall prey to this exception. Would-be beneficiaries of a life insurance policy had alleged that the insurer breached its contractual obligations by not paying out the policy's proceeds. Id. at 141. The plaintiffs claimed that the insurer failed to comply with notice requirements imposed by the D.C. Life Insurance Act and argued that—notwithstanding an Illinois choice-of-law provision in the insurance certificate—the certificate incorporated D.C. law standards. Id. at 146. The Court disagreed, finding that though "D.C. courts might, in some circumstances, decline to enforce state laws that are less protective of individual life insurance for public policy reasons, Plaintiffs have failed to show that such a departure from the ordinary rule is warranted here." Id. at 149.

Here, the MWPCL presents a closer question than does the DCWPCL, but, like in Orchin, neither statute warrants a departure from the ordinary rule. The Court will start with the DCWPCL and then return to the MWPCL.

    1.    DCWPCL

Though Michigan law differs from the DCWPCL, Maloney has failed to show that D.C. law evinces a "strong public policy" against enforcement of Michigan's wage laws. Cf. Nat'l Glass, 750 A.2d at 249–50 (finding Maryland law reflected a strong public policy because it provided that "[a]ny waiver provision of a contract made in violation of this section is void" (cleaned up)). The cases Maloney cites do not compel a different result. She principally relies on Molock v. Whole Foods Mkt., Inc. for the proposition that "employees are protected by the employment laws of the state in which they work." Def.'s Opp'n at 4 (citing Molock v. Whole Foods Mkt., Inc, 297 F. Supp. 3d 114, 134 (D.D.C. 2018), aff'd on other grounds sub nom.

10

Molock v. Whole Foods Mkt. Grp., Inc., 952 F.3d 293 (D.C. Cir. 2020)).  That may generally be true, but the employees in Molock had brought claims under the DCWPCL and MWPCL.  297 F. Supp. 3d at 133.  They were not, as Maloney is here, seeking to defend against a breach-of-contract claim on the grounds that the DCWPCL superseded the law selected in the contract's choice-of-law provision.

    2.  MWPCL

The MWPCL requires deeper analysis but ultimately does not render Michigan law unenforceable.  At the outset, Altarum contends that Maryland law has no bearing on this case because "D.C. law requires the Court to apply the choice of law provision in the Contract, unless doing so would create a direct conflict with the *forum in which the Court sits*"—*i.e.*, D.C., not Maryland.  Pl.'s Reply at 4 (emphasis added); see also Milanovich v. Costa Crociere, S.p.A., 954 F.2d 763, 768 (D.C. Cir. 1992) ("[C]ourts should honor a contractual choice-of-law provision . . . unless . . . 'enforcement would contravene a strong public policy of the forum in which suit is brought.'" (quoting The Bremen, 407 U.S. 1, 15 (1972))).  But courts invoking this principle were not applying D.C. choice-of-law rules.  See id. at 766 (applying "federal maritime law, including maritime choice-of-law rules"); Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Hebrew Homes Health Network, Inc., No. 17-cv-01215 (TNM), 2019 WL 4346325, at *12 (D.D.C. Sept. 12, 2019) (applying ERISA standards).[4]  Under the Second Restatement, cited by

---

[4] In a case cited by Altarum, a court in this district appears to have invoked this principle even though sitting in diversity.  See Top Sure Invs., Inc. v. Marck Properties Grp., LLP, No. 15-cv-048 (ABJ-AK), 2015 WL 13866541, at *2, *4 (D.D.C. Oct. 5, 2015), report and recommendation adopted, No. 15-cv-048 (ABJ), 2015 WL 13866540 (D.D.C. Oct. 26, 2015); see also First Am. Compl. ¶ 10, Top Sure Invs., Inc. v. Marck Properties Grp., LLP, 2015 WL 13866541 (D.D.C. Oct. 26, 2015) (No. 15-cv-048).  But, in that case, the parties agreed to follow the contract's choice-of-law provision.  See Top Sure Invs., Inc., 2015 WL 13866541, at *4.

11

the court in Orchin as a guide for D.C.'s public-policy exception, a choice-of-law provision applies unless (i) "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state" and (ii) the alternative state "would be the state of the applicable law in the absence of an effective choice of law by the parties." Second Restatement § 187.[5] Thus, a court need not necessarily choose between the state designated in the choice-of-law provision and the state in which it sits. Instead, the court must apply standard choice-of-law principles to assess whether the alternative state's law would apply.

The Court will not undertake that choice-of-law analysis here, however, because, though Maryland law is at least plausibly in the mix, this case does not present one of the "unusual circumstances" for which "Maryland courts [] typically reserve application of the public policy exception." Orchin, 133 F. Supp. 3d at 149. In other words, the first prong of the Second Restatement test is not satisfied. To be sure, there is some support on Maloney's side. In Medex v. McCabe, the Maryland Court of Appeals considered whether a contract that conditioned "payment of [] 'incentive fees' . . . upon the employee being employed on the date of payment" violated the MWPCL. 811 A.2d 297, 300 (Md. 2002). The court found it did, characterizing the MWPCL as an "expression[] of state public policy" and deeming the contract "invalid" because it conflicted with the statute. Id. at 304 (cleaned up). As the court noted, however, the MWPCL

---

[5] In Godbey v. Frank E. Basil, Inc., another case cited by Altarum, the court paraphrased § 187 of the Second Restatement as follows: "Unless the parties' choice of law is that of a state lacking a substantial relationship to the parties or the transaction, or unless the chosen law would contradict a fundamental policy *of the District of Columbia*, a District of Columbia court would enforce the contract provision. . . ." 603 F. Supp. 775, 776 (D.D.C. 1985) (emphasis added). In that case, however, the plaintiff argued for the application of D.C. law despite a Saudi choice-of-law provision—and not for the law of some third country or state. Id. Thus, the only realistic alternative to Saudi law was D.C. law.

12

does not include "express language" preventing "statutory contravention by private agreement or contract," id. at 304 n.4, which is what Maryland courts typically require to find another state's law unenforceable, Orchin, 133 F. Supp. 3d at 149. And, it would seem, for good reason. In cases like Medex, where the parties' contract does not contain a choice-of-law provision and the employee goes on to sue under the MWPCL, Maryland law might supersede contrary contractual provisions. But it takes something more for Maryland law to trump the law of another state, especially when the parties agree to be bound by that other state's law. Thus, in the absence of express language in the MWPCL or other evidence of a "strong public policy" against enforcement of Michigan law, the choice-of-law provision here is enforceable.

A contrary conclusion would not help Maloney in any case. Even if the Court were to (i) decline to enforce the choice-of-law provision and (ii) find Maryland law governed according to D.C. choice-of-law rules (as would be the required next step under the Second Restatement's test), the pay-schedule provisions of the Executive Plan and Accelerated Payment Form do not run afoul of the MWPCL. The statute mandates that employers pay "wages" due for work performed before the date of termination.[6] See Md. Code, Lab. & Empl. § 3-505(a) ("[E]ach employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment . . . ."). But the requirement to pay is triggered only once "all conditions agreed to in advance for earning those wages have been satisfied."[7] See Catalyst

---

[6] The parties also dispute the antecedent question of whether the payments constituted "wages" under the MWPCL. The Court need not take a side because it determines Maloney was not owed the payments even if they constituted wages.

[7] In this respect, Maryland wage law is consonant with Michigan law. See Skelly v. Skelly, 780 N.W.2d 368, 371 (Mich. Ct. App. 2009) ("Although two installation payments were made [previously], plaintiff had not earned that money when it was disbursed because he had not

Health Sols., Inc. v. Magill, 995 A.2d 960, 969 (Md. 2010) (The MWPCL requires payment "only when wages have been promised as part of the compensation for the employment arrangement and *all conditions agreed to in advance* for earning those wages have been satisfied." (emphasis in original)). And employers can validly condition the payment of wages on the employee remaining employed for a specific time. See id. at 972 ("The letter agreements between [the employer] and [employee] did not promise an unconditional grant of stock to [the employee]; rather, the agreements explicitly conditioned the right to exercise the grant of stock options on continued employment until a date that was expressly defined."); see also Whiting-Turner Contracting Co. v. Fitzpatrick, 783 A.2d 667, 673 (Md. 2001) ("[S]haring in the profits of the company after two years was promised as part of the respondent's compensation package. . . . Where [early payment] is not a part of the compensation package promised, it is merely a gift, a gratuity, revocable at any time before delivery.").

Because of her early departure, Maloney did not satisfy all the conditions for receiving the 2021 award. As the Court will describe in detail below, the Executive Plan and Accelerated Payment Form required Maloney to remain employed until April 1, 2022 (at the earliest) to earn the payment. That's because annual performance was not the only component of the bonus. One of the Executive Plan's stated "purpose[s] was to attract and *retain* key talent." Executive Plan § 1 (emphasis added). And core features of the plan reflected this retention goal: Scheduled payments were deferred over three years and made "payable only if the Participant continue[d] to be an active Altarum employee on April 1st" of the payout year to incentivize executives to remain. Id. § 4 ("Retention and Incentive Payment: Payment of the incentive award will be

---

satisfied the condition subsequent (i.e., remain employed until May 31, 2009) required by the agreement between him and his employer.").

14

deferred and paid over a three-year period. . . ."); see also id. § 9 ("All incentive awards will be paid to the Participant, subject to the following: . . . Participant must continue to be an active employee on the date of each scheduled award payment."). In short, one of the conditions for earning the award was remaining an Altarum employee on April 1 of the relevant payout year. Maloney did not satisfy this condition and therefore did not earn her bonus.

B. Breach of the Contracts

Because the Executive Plan and Accelerated Payment Form are enforceable, the question shifts to whether Maloney breached the contracts. Under Michigan law, "[t]he elements a plaintiff must prove for a breach of contract claim are: (1) the existence of a contract, (2) a party's breach of that contract, and (3) damages suffered as a result of that breach." Phillips-Johnson Properties, LLC v. Tru Fitness Studios, LLC, No. 325570, 2016 WL 594187, at *3 (Mich. Ct. App. Feb. 9, 2016).[8] Maloney does not contest either the first or third element, and Altarum has demonstrated both. See Section III.A above; Def.'s Resp. ¶¶ 41–47 (Maloney acknowledged receiving and signing the Accelerated Payment Form, admitted that Altarum countersigned the form, and does not contest the authenticity of the form or her signature); id. ¶¶ 49–50, 76–78 (Maloney received the accelerated payment in December 2021 and did not refund it after resigning). Thus, only the second element is at issue, and the Court finds Maloney in breach of the contracts.

This issue is actually quite narrow. The parties do not dispute any facts about Maloney's receipt of the payment or the timeline of events. They quarrel only over the meaning of the words "regularly scheduled payment date" in the Accelerated Payment Form. Recall that the

---

[8] Pointing to the Michigan choice-of-law provision, Maloney concedes that Michigan law governs the breach analysis. See Def.'s Mot. Summ. J. at 10. Confusingly, she does not reconcile that position with her claim that the choice-of-law provision is unenforceable.

15

form included the following caveat: "if I receive the Accelerated Payment and I am not employed at Altarum on the *regularly scheduled payment date* next following the Accelerated Payment Date, [] I must immediately repay to Al[t]arum the full principal amount of the Accelerated Payment." Accelerated Payment Form at 2 (emphasis added). Altarum contends that the phrase "regularly scheduled payment date" refers to April 1, 2022—when Maloney would have received her bonus payment had she not elected to accelerate it. Pl.'s Mot. Summ. J at 10. Maloney counters that the date was December 15, 2021, which was the next payroll date following Maloney's accelerated payment date—*i.e.*, when she would have received her bi-monthly salary installment. Def.'s Mot. Summ. J. at 10–13. Round two also goes to Altarum.

"The goal of contract interpretation is to first determine, and then enforce, the intent of the parties based on the plain language of the agreement." Harbor Park Mkt., Inc. v. Gronda, 743 N.W.2d 585, 588 (Mich. 2007). "Where the language of a contract is clear and unambiguous, construction of the contract is a question of law," Laurel Woods Apartments v. Roumayah, 734 N.W.2d 217, 220 (Mich. Ct. App. 2007), and "the role of the court is limited to determining the intention of the parties from the four corners of the contract and in accordance with normal usage of the English language," Commc'n Enhancement, LLC v. T6 Unison Site Mgmt., LLC, No. 303657, 2012 WL 1890108, at *5 (Mich. Ct. App. May 22, 2012) (cleaned up). But, "[w]here one writing references another instrument for additional contract terms, the two writings should be read together." Forge v. Smith, 580 N.W.2d 876, 881 (Mich. 1998).

The Accelerated Payment Form, Accelerated Payment Policy, and Executive Plan must be read together. The form stated that executives could elect to accelerate their incentive awards "subject to the terms of the Plan," Accelerated Payment Form at 1, and the phrase "subject to" incorporates another contract by reference, see Naturipe Foods, LLC v. Siegel Egg Co., No.

16

327172, 2016 WL 4723312, at *2 (Mich. Ct. App. Sept. 8, 2016) ("The plain, unambiguous language of the contract incorporated the Terms and Conditions. The contract provided that it was 'Subject to Seller's Terms and Conditions.'"). The Executive Plan, in turn, incorporated the Accelerated Payment Policy by specifying that "[p]articipation" in the accelerated payment plan "is governed by the terms of the Accelerated Payment Election Policy." Executive Plan § 8. Thus, the three contracts are, in effect, a package deal.[9]

Reading these three contracts together, the Court finds it clear that the "regularly scheduled payment date" referred to the date Maloney would have received her award had she not elected to accelerate payment—*i.e.*, April 1, 2022 at the earliest. The policy provided that "[a] Participant may elect accelerated payment of a whole percentage of each *regularly scheduled payment of the applicable incentive award* as indicated on the Election Form." Accelerated Payment Policy at 1 (emphasis added). And, as the plan made clear, the regular payments of the incentive award that an executive would receive in 2022 were (i) 25% of the 2019 bonus, 25% of the 2020 bonus, and 40% of the 2021 bonus *on April 1*; and (ii) an additional 10% of the 2021 bonus *on May 15*. Executive Plan § 7. Though the form does not itself define "regularly scheduled payment date," as Maloney notes, see Def.'s Mot. Summ. J. at 11, the cross-referenced policy makes plain that "regularly scheduled payment" refers to the non-accelerated payment of the bonus award. The Executive Plan, in turn, supplies the dates for those non-accelerated payments: April 1 and May 15.

---

[9] Maloney takes issue with the fact that Altarum filed the Executive Plan and Accelerated Payment Policy as a single exhibit to the complaint. See Compl., Ex. A; see also Def.'s Sur-Reply at 5, 9. Though the two are separate documents and must be treated as such, the Court understands Altarum's reasons for filing them together.

Maloney resists this conclusion by highlighting two pieces of extrinsic evidence—namely Altarum's employee handbook and Maloney's paystubs—that, in her view, indicate that the "regularly scheduled payment date" referred to the next salary "pay day." See id. at 10–12.  Per the handbook, Altarum paid employee salaries "on a semi-monthly schedule" with "[p]ay dates" occurring on the 1st and 15th of the month (or the next business day if the pay date fell on a weekend or holiday). Id., Ex. 11 at 55.  Consistent with that policy, Maloney's pay stubs show that she received salary payments on December 15, 2021 and January 3, 2022. Id., Ex. 9–10.[10] Maloney thus contends that the relevant next "regularly scheduled payment date" was December 15, 2021—the pay day after she received the accelerated payment.  But, where, as here, the contract "is clear and unambiguous on its face, a court will not consult extrinsic evidence." City of Grosse Pointe Park v. Michigan Mun. Liab. & Prop. Pool, 702 N.W.2d 106, 123 (Mich. 2005). In any case, even were the Court to consult the employee handbook and paystubs, Maloney's reading strains credulity.  Nothing in the Payment Accelerated Form nor the other contracts it references suggests the parties meant to hook the bonus-payment schedule to Altarum's wholly separate salary schedule.

For similar reasons, the Court will also not consult a previous version of the Executive Plan (as Maloney urges) or wade into the morass of emails and deposition testimony the parties cite.  "Parol evidence of . . . prior . . . agreements that contradict or vary the written contract[] is not admissible to vary the terms of a contract which is clear and unambiguous." Schmude Oil

---

[10] For reasons the parties do not explain or seem to question, Maloney received only her accelerated bonus payment on December 1, 2021—and not any regular pay.  Def.'s Mot. Summ. J., Ex. 8.

18

Co. v. Omar Operating Co., 458 N.W.2d 659, 663 (Mich. Ct. App. 1990).[11] Likewise, when a "contract is unambiguous, [a court] need not consider e-mail evidence . . . [because] [t]he parol-evidence rule 'prohibits the use of extrinsic evidence to interpret unambiguous language within a document.'" Sursely v. Progressive Marathon Ins. Co., No. 364459, 2024 WL 1129816, at *2 n.3 (Mich. Ct. App. Mar. 14, 2024) (quoting Shay v. Aldrich, 790 N.W.2d 629, 641 (Mich. 2010)).

In sum, the relevant "regularly scheduled payment date[s]" were April 1 and May 15, 2022. Maloney does not dispute that she was not employed on those dates, and she therefore breached the contracts by failing to return her accelerated bonus payment.

C. Unclean Hands

Not so fast, Maloney suggests. She contends that, even if she breached the contracts, the Court should not find in Altarum's favor because it has unclean hands. See Def.'s Opp'n at 7–8 ("[A]ny alleged non-performance by Ms. Maloney should be excused by Plaintiff's unclean hands."). But "the doctrine of [un]clean hands only applies to equitable claims, not legal ones." Kitchen Dr., Inc. v. Authentic Properties, LLC, No. 290930, 2010 WL 2757024, at *3 (Mich. Ct. App. July 13, 2010) (citing Rose v. Nat'l Auction Grp., Inc., 646 N.W.2d 455, 463 (Mich. 2002)). Altarum seeks only money damages in Count I—its breach-of-contract claim and the only count at issue in its summary judgment motion. Compl. ¶¶ 41–43, Prayer for Relief; Pl.'s Mot. Summ. J. at 22. Therefore, the doctrine of unclean hands has "no effect on [the Court's] holding with respect to the breach of contract claim." Kitchen Dr., 2010 WL 2757024, at *3.

---

[11] Parol evidence may be admitted if "it bears on the threshold question of whether the written instrument is [] an integrated instrument." Schmude Oil Co., 458 N.W.2d at 663. Maloney does not assert that the 2021 version of the Executive Plan was not integrated nor does she seek to introduce the earlier version to address that issue.

D. Fees as a Sanction

Finally, Altarum requests fees incurred in preparing its summary judgment briefing as a sanction for Maloney's litigation conduct, both before and after she changed counsel. Having carefully considered the parties' positions and focusing specifically on Maloney's current counsel's conduct, the Court declines to impose that sanction.

IV. **Conclusion**

For the foregoing reasons, it is hereby

**ORDERED** that [ECF No. 47] Altarum's Motion for Partial Summary Judgment is GRANTED. It is further

**ORDERED** that [ECF No. 48] Maloney's Motion for Summary Judgment is DENIED. It is further

**ORDERED** that by May 7, 2024 the parties shall propose a joint plan to govern discovery on Maloney's counterclaims or other further proceedings in this case.

**SO ORDERED**.


Date: April 23, 2024

CHRISTOPHER R. COOPER
United States District Judge